Good morning, Your Honors. May it please the Court, Counsel? My name is Vicki Ruby and I'm appearing on behalf of Defendant Appellants. There are two discreet legal issues in this case. First, whether it was clearly established that using flashbangs and less lethal munitions to arrest a man with ready access to a firearm engaged in a police standoff is constitutionally excessive. And second, whether it was clearly established that using deadly force against that man who reaches for and picks up a gun during the standoff in an attempt to take him into custody violates the Fourth Amendment. As neither principle was clearly established at the time of this incident, July 2, 2019, the officers are entitled to qualified immunity and the District Court's decision denying qualified immunity should be reversed. So the way you phrase your argument makes me wonder, are you conceding that there was a Fourth Amendment violation with respect to the flashbang and the nonlethal force? No, Your Honor, I'm not. The less lethal force here, the flashbang and the less lethal munitions, was constitutionally permissive under this Court and all applicable jurisprudence. Here, first of all, I'll address the less lethal munitions, since Your Honor is raising the less lethal plan first. At the time of this incident, it was the law that you could use less lethal munitions against even protesters. Here, Mr. Aden is a far greater threat than a protester. He has a gun. We know it's a real gun with real bullets because he discharged it earlier in the night. He has a gun that he's refusing to move away from. While it's down on the ground, it always remains within an arm's reach. According to the District Court's findings, it's one to two feet away from his hand at all times. What the officers were presented with was a highly dangerous and unpredictable situation. They had warned Mr. Aden that they were concerned about the gun, that the gun was still in play because it was next to his foot. They had an opportunity was presented to them where they thought they could take him into custody using less lethal munitions. There simply isn't law that says it's unconstitutional to use less lethal munitions and flashbangs under this circumstance. The flashbangs, the first time the Court substantively addressed flashbangs was actually three weeks after this incident in ZJ versus Kansas City. At the time that the flashbangs were addressed in ZJ, well, the Court found that the flashbangs in that case, which were thrown into an occupied residence where someone was cooperative and coming to the door to open the door, the suspect was already in custody. They had no reason to believe a gun was in play. There the Court did take issue with the flashbangs. But in the opinion, the Court went on to say it's likely reasonable if the individual is known to be armed. Here Mr. Aden is armed. It's also likely reasonable if there's a need for an element of surprise. Here the officers in their discretion determined that surprise was a necessary element, that they had a window of opportunity of an unknown duration to try to take Mr. Aden into custody. And so they did so. What about the fact that there was no like sort of imminent threat? The fact of the matter was, is he was sitting there as the District Court found. Yes, he had a gun nearby, but ultimately there was no imminent threat on any of the officers until the flashbangs were thrown. What do we do with that? Well, I would argue that there was still a threat because he has the gun. A standoff remains threatening at all times until the individual surrenders the firearm. Here he didn't surrender the firearm. I see Your Honor's point that he didn't have the gun in his hand at that time. And he was sitting quietly from what I could tell. I mean, he was talking to the negotiator and he was sitting there not doing anything. Well, he was sitting and he was speaking to the negotiator. But what was he saying to the negotiator? I'm as far as I need to be away from that gun. I'm not going to jail tonight. I am not surrendering this weapon. He's told, I mean, you're just still a quick grab from the gun away. You have to understand that gun is in play and we are concerned about the gun. Yet he moves away from the gun. You see that in negotiations transcripts. You see that in the radio transcripts. You see that in the CAD. And then he starts moving back towards the gun to the point that he's within one foot to a foot and a half to two feet from the gun at the time that the less lethal plan is authorized. The officer is an objectively reasonable officer under those circumstances has every basis to conclude that a window of opportunity to attempt less lethal, to avoid having to use is a paradigm, dynamic, excuse me, judgment call that courts don't second guess. Even if in hindsight we say, well, they could have, should have done something different. That's not the framework with which excessive force claims are judged. Excessive force claims are judged with whether the conduct fell within a range of reasonableness. And here it did. And furthermore, there's no case law out there that put the officers on fair and clear notice that using less lethal munitions and flash bangs under these circumstances was constitutionally excessive. Although if we go the latter route with the clearly established route, then we still are left with the Monell claim. If we, if we say it's objectively reasonable, then there's no constitutional violation. So since you brought it up, can you address that particular point, the Monell claim? Well, the Monell claim is our position that that falls on its face because the conduct was reasonable. I understand that Your Honor is, is drawing the two distinctions. Here, the reasonableness of the less lethal plan is evident in the fact, again, the window of opportunity. The, the district court's findings, which are supported by the audio evidence before the court, which is supported by the video evidence before the court, is that Mr. Aden still had that gun within arm's reach. That is a pivotal key fact in this case, which is undisputed. And with that gun within arm's reach, the officers can use less lethal force. Here, it's not deadly force, less lethal force to try to take him into custody. This, our position is that this scenario has been considered, for example, again, in Puskas, which is a Sixth Circuit court decision, in which the suspect, a domestic violence suspect, has guns on the ground in his yard with ready access to those guns. There, the less lethal that was attempted was deploying a K-9. And the court said, yes, he is a threat that justifies that less lethal force, there, the K-9, because he has ready access. He could pick up that gun in a moment's notice, and a reasonable officer would consider that gun in play and a threat because he has had opportunities during the course of a standoff to walk away from the gun and has refused to do so. Let me ask it this way, which is, does the resolution of the Monell Claim depend on us agreeing with you on objective reasonableness? From what I can tell, you had the Chief of Police making this call, and so it seemed to be a policy of the Department. So do we have to agree with you that it was objectively reasonable in order to dismiss the Monell Claim? My position on that would be that the Monell Claim does fail because it is objectively reasonable, and that as soon as the Court decides that issue, that there is no underlying constitutional deprivation, that the Monell Claim falls on its face. But that's the only way we get there, right, at least from your point of view? Well, as soon as there is no constitutional deprivation, yes, Your Honor, the Monell Claim  To ask it another way, because you initially, in your opening line, suggested that we should decide this on the question of whether it's clearly established. So if we went that direction, what would happen with the Monell Claim? The Monell Claim, I would submit, based on both the briefing as well as the arguments that are being made to the Court today, still falls. There is no underlying constitutional deprivation. There is no basis for a Monell Claim. Now, let me try again. If we were to decide, as you, I think, suggested in your opening line, that we decide the nonlethal force question on the clearly established as opposed to objectively reasonable, if we were to decide it on that basis and say it's not clearly established, what would happen with the Monell Claim? Your Honor, perhaps my opening line was not as articulate as I would like in light of the questioning. I think if you decided on, you still need an underlying constitutional deprivation. And here, the one point that, and I will get to your question, the one point You understand we can decide it on either one of those prongs. I do. And I would encourage the Court to decide it on both. It fails under both prongs. I understand Your Honor's question, if there is no constitutional deprivation, the Monell Claim falls. Yes. That, I would agree that that's the nature of the law. The other thing that I would add Well, let me try again. Because I think the point Judge Strass is getting at is, what if we decided it, if we decided to decide based on clearly established, then what would happen with the Monell Claim? If you were to decide this on clearly established, there still would be no underlying constitutional deprivation? Those are two different things. If we skipped the first one and said we don't want to decide whether it was objectively reasonable, but it wasn't clearly established in any event, we could do it that way, then what would happen to the Monell Claim? The Monell Claim would fall for two reasons still. One, our position as argued to the district court was that it wasn't pled, but I see Your Honor's frustration. If the court decides it's not clearly established, that would fall, I guess, outside of the Monell Claim, that there's no constitutional deprivation. That's our argument why the Monell Claim falls. The secondary issue with that Monell Claim is that it wasn't pled, and plaintiff can't rewrite their complaint at the summary judgment stage, and that's exactly what the district court allowed the plaintiff to do in this case. So in any event, even if you decide it purely unclearly established law, you can look at the pleading and say the pleading doesn't plead the theory that plaintiff then advanced at oral argument before the district court, and that plaintiff, we don't blue pencil a complaint after summary judgment's been briefed, which is the second basis to deny that Monell Claim. I do want to briefly, and very briefly- Ms. Ruby? Ms. Ruby, this is Jed Smith. One quick question. The district court made a determination that fact issues, material fact disputes were at issue with respect both to the less lethal and the lethal use of force. Why is that determination at this point incorrect and not an appropriate basis for allowing the matter to proceed and have qualified immunity be taken up once those fact disputes are resolved? Your Honor, with due respect to the district court, I disagree that there are fact issues in this case. I direct the court to the factual findings, which were not actually applied by the court. For example, the court took issue of whether or not Mr. Aden is armed or unarmed. The court found that the gun was always within reach, one to two feet away. So saying that he's unarmed, a legal conclusion is not dispositive. Whether he's a threat is a legal conclusion, which can be drawn from the predicate facts. And our position is that there is not a single fact in dispute. The facts have been pled in the complaint. We've accepted the facts as found by the district court in their fact findings. We only contest legal conclusions drawn from the predicate facts, and that is not sufficient to deny qualified immunity in this case. I'd like to reserve the balance of my time, unless Your Honors have any questions at this point. Hearing none, very well. Thank you. Good morning. May I please have your attention for a moment? First, I'd like to apologize. It's the most awkward opportunity to get sick. It's probably the biggest case of my life. But nonetheless, I intend to highlight for the Court as much as I can. If necessary, I'll ask my colleague to step in. First to answer Judge Strzok's question, the male claim does survive. It does survive. Just if you rule on prong two, the claim survives. So it's a matter of law. It's not very complicated. When talking about the less lethals and talking about whether there's a clear rule of law, on July 2nd, 2019, it was very clear that less lethals are to be used for barricaded individuals who are demonstrating violence or threatening officers who are not communicating with them. And the public is not, is in danger. You have the exact opposite here. Every case that they cite, Bing, Buskus, all involve someone who either is keeping guns out of sight, Buskus, he hid them around the yard. Bing, he's got a stash of them in the house. He's been on a three-day bender. He's been on inhalants. And he was unresponsive to the throw phone. They tried to reach him. The sergeant in Bing says it best. He said, if he hadn't shot us, we would have just waited. It's conveying that they wouldn't have used that level of force ever. This is the only case. How long do they have to wait? I don't think there is a certain time period. You concede they had grounds to arrest him, right? Oh, certainly. They definitely had grounds to arrest him. They had probable cause to surround him. They had probable cause to take him into custody. The issue is how much resistance was he putting up at that point relative to how much force they used. Well, okay. That raises an interesting question because I think the district court tried to characterize the resistance as passive. I'm not so sure I agree with that when there's a gun several feet away from him and he's saying, I'm not going to jail. And then you combine that with, I think, the law that suggests that officers have the right to use a reasonable amount of force to effect an arrest. So tell me how that's passive resistance when he has a gun within arm's length. I think the other hallmarks are missing from the description from the defense. First, they had containment. They had a perimeter. They had cleared all the surrounding buildings, all the buildings. Everything was closed. They had cleared the Everbridge, the stand in place. They had released people to go back. So to the extent that there was a danger that had been diminished, he was actually communicating with the negotiators at the time they went through this plan. Nothing had changed. They described this as a tense, ongoing situation. It may have been tense. I'm not going to deny there was a weapon present, but it wasn't fluid at that point. It was as static as you could get. He had complied. He had complied with their initial request. What about the opposing counsel's point that he was moving, he was talking to the negotiator, but he mentioned that he was not going to jail, but he was also moving a little closer to the gun. Doesn't that sort of raise the stakes for the officers? At that point, though, he had been speaking back and forth throughout the evening. He had been talking to them for about 90 minutes. The negotiators themselves said when they played the audio recording of the girlfriend, he leaned into it. He was trying to hear it. They believed they had a hook. They believed they had something, finally, to get his attention, leverage to get him to start complying. They were actually believing that they were going to resolve the matter, but the chief of police didn't believe that. He thought the negotiations had stalled based on what he knew from watching TV. That should shock the court. What should also, though, is the degree of violence used here. They used the case of the protesters and the 40mm sponge rounds. What they leave out is that the protesters were walking towards the officers, and they only used the sponge rounds. There is no case where flashbangs are thrown at people. They weren't thrown towards him. The officers who were throwing the flashbangs were aiming for the gap between the gun and Mr. Aden. As they saw, at that point, they can't run from that fact. They can't run from, they're aiming for, two feet spot. But none of them hit him, right? I mean, they were very close, but they didn't hit him. They didn't hit him. One exploded at his eye level. The other one, by that point, the second and third, he was moving to his right at that point, and so they didn't come in contact with him. Was there any evidence that it would have been, I mean, when you use those outside my understanding, and it's sort of a layman's understanding, because I've heard people talk about flashbangs, is you've got to throw it close enough to somebody where it actually has the desired stunning effect, especially when the object is outside. Was there any evidence in the record talking about that, about how close they needed to be in terms of where they threw it? I believe the warning labels for both the 40mm and the flashbangs are in the record, and they specifically, as it relates to the 40mm, as the other cases I've found, indicate there's zones where you can target things like that. The flashbangs do talk about proximity. Not to do, I believe, within five feet is the threshold. So in that regard, just to answer your question, Your Honor, about passive versus active, our position is that it was very much passive, that you had a situation that had de-escalated. Officer Thole, when he first arrived on the scene, confronted a much different person than the officers were dealing with at 1038. Mr. Aiden was no longer standing. He wasn't saying anything affrontive to the officers. Every officer on the scene relayed, through depositions and their own statements, that Mr. Aiden uttered nothing negative to the officers. He never threatened them. He never gestured towards them. He remained engaged with the negotiator. And part of that is, also, you asked the element of time. The reality is the negotiation only took, in effect, 90 minutes. They were delayed in getting this negotiation started because they had not configured their phone system, so they couldn't talk to him. They were shouting at him through a Bearcat speaker, but he couldn't respond because they have multiple engines running in a Bearcat, and the officers are inside of them. So there was no dialogue at that point. Then they gave him a device where he could talk to whoever he wanted, and then they brought the victim to the scene and lost control. So when they finally got control, it wasn't until 10 o'clock. It wasn't until 10 o'clock that they actually had control. They took the case. At that point, you have 35 minutes of negotiation. There isn't a case that has 35 minutes of meaningful negotiation. It's well beyond the normal passage of time. The Escobedo case, the negotiation was four hours. At that point, he also was wielding a weapon, and he could also shoot. There was a daycare nearby. There was a public concern. At this point, if businesses had started to reopen, say we're nearing early morning, there's a game changer. Then the public is coming back. Then there's pressure on the police to do something to keep the public out. That was the primary issue. They couldn't keep the public away. Everyone wanted to see. That was the number one reason why they were so aggressive, is that the public wouldn't leave. Bing highlights actually a case called O'Brien. They use it as a contrast. O'Brien is a wonderful description of what's happened here. The individual didn't threaten the officers. He communicated with the officers. He remained engaged, and they could see whether he was posing a threat at the time. What about the fact that the gun discharged in, you know, when he was running away? They knew that. They didn't know why. They didn't know, I think, they didn't know it was an accident. Is that a game changer for the police in terms of knowing he knew how to use it and was willing to use it, potentially? I think it's undeniably relevant, but at the same time, I don't think it factors into what they knew at that precise moment of using the force. They knew at that point, he had thrived, that he had tripped, fall through it. They knew from the state trooper that the report was someone is in the woods, and they heard a shot go off, which then conveys if the report was he was in the woods, which means no one was around. He wasn't trying to do it towards someone. So it does give credibility to what his self-report was. So to that end, all these things come together. And when considering at that point whether there was a threat that justified this level of force, it's just absent. Mr. Wilson? Oh, yes. This is Judge Smith. Was that one of the disputed facts that the district court relied on in denying summary judgment that the discharge in the woods was potentially involuntary? I believe it factored into the court's analysis whether he was a danger or was he still passive versus active. That's correct, Your Honor. I do think because also assuming the facts from the perspective of the plaintiff for purposes of summary judgment, that was our position is that he was credible in that report, and the report from the state trooper from the 9-1-1 call was consistent with that report. So before I lose the remaining time, I must speak about the lethal force as well. First, I'll make it very clear, we're not arguing the provocation theory. It keeps coming up in the defense argument. We are not saying that the officers created the need for force. That's what Shultz prohibits, not getting close to it. But we can't have it both ways when at the precise moment that they're using the force, that a reasonable officer wouldn't take into account what the officer knew about the situation when assessing whether there's immediate threat. These events don't happen in a vacuum. And so when describing it and trying to prohibit all that we knew up to date at that moment, well, we have to take into account what each officer, a reasonable officer in each respective officer's position would have known. So they knew, for example, that he, you know, what Mr. Aden was doing before they started the tactical raid. In addition, they knew that the plan contemplated hitting him, which was going to cause movement. And that has, a jury needs to reconcile the fact that a reasonable officer would have anticipated that movement and how that factors into whether they could perceive the movement that he had as either being threatening or moving away from the rounds that are coming at him from the left. He moved to his right. As Glenn highlighted, he took the obvious line of retreat. The defense doesn't dispute, neither do the officers. He put his left arm up, shielding himself from the shots, from the less lethal's coming from Officer Pilcher and Officer Melzer. They were shooting from a distance. You're undisputed in appearing in the video. You're correct in terms of the movement away from the flashbang, and it happened to be towards the gun. But it seems indisputable that he actually acquired possession of the gun and ultimately discharged it. How does that play into the analysis of the reasonableness of the officers in their use of force? Your Honor, the body of law suggests that when possessing the weapon itself, when the officers can see the weapon, it does not impose an immediate threat. There's a clear divide between when the officers can't see what the person is doing, whether they have a weapon or not, and then they turn, they spin blindly on an officer. The case law, case after case suggests that when they can't see the full field, then at that point, then they have a lot more license to act. They can perceive immediate threat. But when they can see, when there's no one around, it's just him, and they can see the weapon, then he's got to do more than just pick up the weapon. And the evidence viewed in favor of the plaintiff shows it didn't even get above his knee, maybe to his shin, and he's hunched over, which means he's not standing erect. And then, in the record, you have a credibility problem because you have the officers all seeing different things. Some of them are describing full body extensions behind them to reach a bearcat that's behind him at this point as he's moving. Others are describing he's running towards a bearcat. The video doesn't show that. So the defense points to a — So the district, Mr. Wilson, the district court did suggest in denying qualified immunity that there remained fact disputes. The vast majority of this is on video. So what are the fact disputes that are left? There are disputes relative to, I think, a final determination of what was Mr. Aden doing with the weapon. The parties disagree. VMLE disagree with it. We maintain that it was never pointed at anyone. They maintain it was. We have a fundamental dispute as to whether he's aiming — taking a shooting position with a weapon. Relative to the question of the discharge, we have a disagreement as to whether he fired the weapon at anyone or was an involuntary discharge because he had been shot so many times once he was laying back on the ground. We have a dispute as to whether they should have stopped shooting, even if there was a reasonable shot by Officer Peterson. Officer Nelson is much different. He shoots him in the back. Officer Steyer shoots much later. Officer Kyle, much later. So the defense tries to lump them together. They're divisible in that regard. I see I've expended my time. Thank you. Thank you, Mr. Wilson. Your Honors, I'd like to direct you to the Qualified Immunity Framework because plaintiffs' alleged fact disputes here turn it on its head. They focus on the innocent motives of Aden rather than how an objectively reasonable officer would view his conduct. We don't worry about the subjective intent or innocent motives of a suspect. We solely focus on how an objectively reasonable officer would view the conduct. Here we've got a report that he's threatened a woman with a gun, making her concerned for the safety. The court found that in footnote two. We have that he ran, that he ran and that they tried to set up a police perimeter and he ran through it. We have that he's four hours into an engagement with officers and he's still got the gun. He's refusing to surrender it, refusing to walk away. How does a reasonable officer look at that conduct? Later when we're talking deadly force, how does a reasonable officer consider picking up a gun? This Court has had the opportunity to consider picking up a gun and that is a menacing action in and of itself. You look at Liggins, McElroy. You also look at United States v. Hill where there's a quote that we have in our brief about the danger associated with picking up a gun. The innocent explanations do not govern this case. Plaintiff identified... Let me ask you about the gun really quickly because I don't think, I watched the video several times, I don't think he ever raised the gun and the district court found it never came above his shin and in fact when it fired, it fired towards the ground which was a finding by the district court. Is that correct or is there a dispute about that? There's, for purposes of summary judgment, there's no dispute about that. Our position is that picking up the gun, picking it off the ground, raising it up to the shin height as the district court found, that's a threat. An officer does not need to be staring down the barrel of a gun before they respond with force. And this Court's doctrine for over 25 years has repeatedly, time and time again, most recently in N.S., reiterated that principle that officers don't have to bet their life on what a subject with a gun is going to do with a gun. But that lens with which we look at qualified immunity, that governs the entire encounter. Plaintiff said events don't happen in a vacuum. They don't. The totality of the circumstances starts as soon as Miss, as soon as the girlfriend drives into oncoming traffic at rush hour, flees her vehicle, which in plaintiff, in his own words in paragraph 135 of the complaint says, yeah, they think that it was, I was trying to kill her based on her actions. Officers can credit that. They can credit it from the totality and that informs their decision to try to take Mr. Aiden into custody when they think they have a window of opportunity to do so. And it informs the decision under 3.2 seconds to use deadly force. That's how long plaintiff says the deadly force was used. It was used like this. With 1.6 seconds into it, Aiden discharging his gun. For that reason, we'd ask that. Ruby, one quick question. I hate to use hindsight and I know we're not supposed to, but why does it make sense to hit him with the less lethal rounds on the left side? Seems to me that that almost causes a movement to the right, which is toward the gun in this case. Well, Your Honor, I will tell you the record shows that the officers believe that he would crumple away from the gun, that it would make him bend to the side. But even if they're wrong with that, that's still afforded protection because their judgment and how to go about this is the type of judgment calls it. The court does not second guess. Very well. Thank you, Your Honor. Thank you. And I don't know if I said I'd ask that you'd reverse, but I make that request. I hope you understand. Thank you, Your Honor. The court appreciates both counsel's appearance and, Mr. Wilson, you made it through. I hope you feel better. Case is submitted and we will issue an opinion in due course.